# Bank of Mobile *v.* John L. Harris.

| 6 | 811 |
|---|---|
| 114 | 327 |

Where a debtor in insolvent circumstances transfers all his remaining property, consisting
principally in stocks, to a brother residing in a distant State, who had never before
engaged in stock speculations, taking the purchaser's notes for a large amount of the price
of the sale, it will be regarded as a transaction not in the usual course of trade, and, so far
as creditors are concerned, will be annulled.

The debtor who sells the whole of his property to the prejudice of his creditor, is presumed to
do it with the intention of defrauding him; and a purchaser who knowingly aids the debtor
in carrying out that intention, will be considered as a party to the fraud, and the property
so conveyed be made subject to the claims of the creditors of the insolvent. The purchaser
in such case, upon the annulment of the sale, will be entitled to a restitution of the price,
only so far as he can prove it has enured to the benefit of the creditors.

A PPEAL from the Third District Court of New Orleans, *Kennedy*, J.
*Benjamin* and *Micou*, for plaintiff. C. *Roselius*, for defendant. The
judgment of the court was pronounced by

Preston, J. The Bank of Mobile sues the defendant to annul a mortgage
on a house and lot on Royal street and two slaves, executed on the 6th of June,
1848, by *E. B. Harris* in favor of the defendant, to secure a sum of about ten
thousand dollars, on the ground that *E. B. Harris* was insolvent at the time,

and that it was made to give an illegal preference to the defendant over his other creditors.

They seek, also, to annul the transfers made by *E. B. Harris* to the defendant, in the summer of 1848, of the following stocks: 294 shares of the capital stock of the New Orleans Canal and Banking Company; 305 shares of the stock of the Bank of Louisiana; and 300 shares of the stock of the Mechanics and Traders' Bank of New Orleans. They allege that the sales and transfers of these stocks were fraudulent and simulated, and that the apparent sales were but trusts for the benefit of *E. B. Harris,* and intended to delay and defeat the real claims of the plaintiffs against him.

The plaintiffs held bills of exchange, which were accepted by *E. B. Harris,* to the amount of $35,000. They were protested the 1st and 10th of May, 1848, and suit was instituted upon them on the 20th of July, but on allegations of fraud against the President and Directors of the Bank of Mobile in obtaining the acceptances, a jury trial was claimed, and judgment was delayed until the middle of December. Executions were then speedily issued, and about five thousand dollars of the debt has been made, not, however, much exceeding the interest, and the execution has been returned that no property could be found to satisfy the balance of the judgment.

Between the protest of the acceptances and the rendition of the judgment, the house, lot and slaves were mortgaged, and the stocks in controversy transferred to the defendant. A large amount of other stocks have, since the protest of the bills, been transferred by *E. B. Harris* to the defendant. Some others were transferred by him to banks, in payment of debts for which they were pledged. An undivided interest in another lot of ground has been mortgaged to a bank for debt, and the whole visible means of *E. B. Harris* has thus been exhausted. *E. B. Harris* is the brother of the defendant, and the transfers of the stocks which have been specified, are attacked as simulated.

The principles of law which govern this case are contained in the code. They give to creditors, when there is not a cession of goods, an action to annul any contract made in fraud of their rights. The action can only be exercised when the debtor has not property sufficient to pay the complaining creditor. Every contract shall be deemed to have been made in fraud of creditors, when the obligee knew that the obligor was in insolvent circumstances, and when such contract gives to the obligee, if he be a creditor, any advantage over other creditors of the obligor. No sale, however, or other contract, made in the usual course of the party's business, can be annulled, although the party was in insolvent circumstances, and the person with whom he contracted knew of such insolvency. Articles 1965, 1966, 1979 and 1981, C. C. Trusts are prohibited by our laws, and simulation can give no rights as to third persons. The frauds to which these principles apply, can generally be established only by presumptive evidence, and as to the presumptions, the code prescribes that they are left to the judgment and discretion of the judge, who ought to admit none but weighty, precise and consistent presumptions. Art. 2267, C. C. The remedy, in case transactions are annulled for fraud on behalf of the parties to them, is pointed out by article 1977, C. C.

*E. B. Harris* was a speculator in stocks, for the evidence shows that in May, 1848, he held them to an amount exceeding two hundred thousand dollars, and that they were pledged to banks for nearly half their value, probably to raise money, with which to make the purchases. He was protested on the 1st and 10th of May, 1848, on his acceptances, to the amount of $35,000, and remained under protest for this large sum until the 6th of June, 1848, when the mortgage in controversy was executed.

To remain under protest, for a length of time, is regarded as evidence of insolvency among merchants and stock dealers in all mercantile cities. It must necessarily be so regarded among them in order to support the credit which is essential to mercantile and banking operations.

The presumption of the insolvency of *E. B. Harris*, arising fromt he fact of remaining under protest for so large a sum, and for so long a time, is reduced almost to certainty by the testimony offered .by the defendant to show the solvency of his brother at the time. An estimate of his property was made on the 15th of May, 1848, by a committee of the Louisiana State Bank. His indebtedness is stated at $227,000; his means at $236,000 ; showing a surplus of $9,000. But it is evident the debt of $10,000, for which the mortgage in controversy was given, was not taken into consideration, and *Mr Hepp*, who made the estimate, thinks the debt of $35,000 to the Bank of Mobile, was not included in the statement. This is rendered more probable, by the fact that the debt was disputed by *E.B. Harris*, who himself furnished the statement, and moreover expressed, at the time, an unwillingness to pay debts contracted on account of others. Independently of the proof of his insolvency by the figures, all experience in this country has shown, that such an enormous indebtedness running upon interest, has never been paid by means so nearly equal in estimate. A single creditor for a large amount, as in this case, pressing his claim on account of not being placed on an equality with others, always disipates such an imaginaay surplus, and leaves only dividends, or nothing, for the ordinary- creditors. If *Harris* was really solvent in June, 1848, there was nothing in the prompt sale for cash, at fair prices of stocks, of which his assets principally consisted, to produce a deficiency of thirty or forty thousand dollars by judgment, on which, within less than a year afterwards, nothing could be made by execution.

We are satisfied, therefore, that he was insolvent at the date of the mortgage in controversy. The excitable character of *E. B. Harris*, the agitation of mind which he manifested, and his disposition to talk of his misfortunes, exposed them to the public, induced the banks to investigate his solvability, and leaves not a doubt that his brother of whom he had been the agent, but who was here and accepted the mortgage, was apprised of them, and knew his situation as well, or better, than any one else.

The debt of $10,000, for the security of which the defendant took the mortgage, being for money collected by *E. B. Harris*, as his agent, and not paid over, must have rendered it certain to his mind that *E. B. Harris* was insolvent, as nothing but absolute inability to make payment, could have induced him to subject himself to a debt of that character, and then spread the facts on record in the mortgage office. The mortgage has the effect of injuring the plaintiffs; because, being unable to satisfy their execution by other property, as proved by its return, they are unable to realize anything from this mortgaged property on account of the incumbrance.

The transaction comes, then, within the definition of fraud in such cases as given in article 3324 of the C. C. It means any unfair preference which the debtor may give to one of his creditors over the others, by selling or mortgaging to him a portion of his property, for a debt existing before the contract. And by article 1973 of the C. C., in addition to those already cited, the plaintiffs are entitled to have the mortgage annulled. The facts and reasoning as to the mortgage, apply equally to the sales and transfers of the stocks, the validity of which are contested by the plaintiffs. But with regard to them, there are other facts which it is necessary to notice. *E. B. Harris* mortgaged his real property to

the defendant and a bank, and disposed of some of his stocks in payment of bank debts. The whole of his remaining stocks, constituting everything he possessed, he sold to his brother. For, beside the sixty thousand dollars worth of stocks, the sales of which this suit is brought to annul, the defendant came into the possession of other stocks of nearly sixty thousand dollars in value, being the whole remaining assets of his brother. It is true, the sale of three hundred and ninety-two shares of Canal Bank stock was made to *Messrs. Hill, McLean & Co.* But *Mr. Hill* applied to the bank to which it was pledged in order to make arrangements to purchase it for the defendant. He offered to give the defendant's note for the amount for which it was pledged, to which the bank objected. *Mr. Hill* then gave the note of his firm, and took the transfer in their name; but soon afterwards transferred it to the defendant, charging him only a commission for the transaction. This leaves no doubt that *Mr. Hill* purchased it with the intention of conveying it to the defendant, being his factor, and willing, as he testifies, to have lent his name, or to have advanced funds for his use to any amount.

Thus, *E. B. Harris* disposes of the whole of his property. He was a resident of New Orleans, and a purchaser of stocks. The sudden sale of the whole of those belonging to him, and disposition, at the same time, of all his other property, was out of the ordinary course of his business, or, indeed, of any business. So, on the other hand, the defendant, who purports to have purchased a hundred and eighteen thousand dollars worth of those stocks, was a capitalist residing in Virginia, where it is probable, equally safe and profitable investments could have been made, under his own eyes. He owns plantations and slaves in Louisiana and Arkansas, and lands in Tennessee and Mississippi. Real estate and slaves had been the objects to which he had directed his investments, and had never before purchased a dollar's worth of stock in New Orleans. He suddenly invests one hundred and eighteen thousand dollars in our stocks. He not only invests surplus capital, but gives out his own notes for large amounts of the stocks, at one time, for $14,000, and afterwards for $20,000, for which they were pledged. He does not go into the market, through the agency of a broker, but buys the whole from his brother. His brother, the vendor, seems to be his real agent in buying for him, and *Jacobs* his nominal agent; for, by the testamony of the latter, he appears to have known but little about the transactions, except in their results. All these things are out of the ordinary course of business, as to vendee, as well as to vendor, and do not wear the aspect of real transactions. The sale of all his assets, by an insolvent to his brother, while suit is pending, or judgment unsatisfied, for the very debt which rendered him insolvent, throws the suspicion on the transactions, that they were prompted by the pervading motive to screen those stocks from the execution for this large debt.

Our laws declare the property of a debtor, the common pledge of his creditors, and that the proceeds of its sale must be distributed among them ratably, unless there exist among the creditors some lawful causes of preference. Art. 3150.

*E. B. Harris* being insolvent, it was his sacred duty to give effect to these principles of equity. Yet, it appears, that he mortgaged and otherwise disposed of the whole of his property, while the plaintiffs were prosecuting to judgment and by execution, their claim on his acceptances; the protest of which rendered him insolvent. This was inequitable, and a violation of an express provision of law.

The evidence induces us to believe that he did so, to put himself in a position to dictate the terms on which he would compromise with the plaintiffs, and compel them to receive a portion of what was due to them, for ten cents on the

dollar was talked of as a compromise. This motive and principle is repudiated by our laws and jurisprudence. *Graves et al.* v. *Roy*, 13 L. R. 457. The just principle of the Spanish law still prevails, that the debtor who sells the whole of his property, to the prejudice of a creditor, is presumed to do it maliciously, and with the intention to defraud. 5 Part. tit. 15, l. 7.

The evidence leads us to conclude that the defendant knowingly aided in carrying out these unlawful intentions of his brother, by purchasing, knowing him to be insolvent, all his assets, out of which the plaintiffs could realise their debt. It is impossible to believe that he purchased these stocks, merely to speculate on the misfortunes of his brother. In fact his agent, *Jacobs*, whose knowledge is his, says as to one of the large purchases: "I wished to put *John L. Harris* into possession of all the rights of the bank, as I knew that *E. B. Harris* was in difficulties, and that suit had been, or was about being brought against him." *Mr. Hill*, who made a large purchase, evidently intended for the defendant, consulted his attorney, to know if it would be safe to make the purchase, notwithstanding the suit against *Dr. Harris* was going on. He, therefore, knew of the suit and took a precaution not usual in the purchase of stocks. So the defendant spoke to his factor, *Hill*, of selling the stocks to pay *Dr. Harris'* debts, and said that if he made a great deal of money by the stocks, he might compromise with the Mobile people, and free *Dr. Harris* from debt, but only in case he could make such an arrangement as would be satisfactory to himself; and, further, said that if *Dr. Harris* was ruined, he never should want. *Mr. Egerton*, too, believes that *Dr. Harris*, in applying to him to rescind a sale of stocks made to him, in order to resell them to his brother, stated that if the stocks should rise, he would have the benefit of the advance. This witness said, of the manner of *Dr. Harris*, "many things are conveyed to the mind, by the manner of the party." So, we are obliged to say, of this whole case, it conveys to the mind many things which are not apparent. We must exercise the discretion confided to us by the code, and look through the apparent, into the real transactions of the parties, which are covered by but a thin veil.

We could not doubt the simulation of the transactions, even if the parties were strangers; the presumption is greatly increased by their relationship of brothers. And, in our opinion, it would have manifested true fraternal affection in the defendant, to have let the property of his brother go to his creditors, to whom it belonged, without making a profit out of it to their prejudice, and thus not to have subjected his name to the suspicion of concealing it from their just pursuits, with a view to force them to an unjust compromise, by putting the property beyond their reach; and, finally, the brother having applied the whole of his property towards the extinguishment of his obligations, to have extended to him the rich munificence of a wealthy brother.

These investigations, which have become deplorably common in our courts, are painful indeed; but it is our sacred duty to search the transactions, out of which they originate, to the bottom, and strike at the root of the evil, by annulling them, as the only means of their prevention. Courts, mortgage offices and paper titles must not be used as the means of depriving men of their property, instead of securing their rights.

In conclusion, we have to say, that the real attitude of the parties seems to us to be this, that the sales were made with the intention, both on the part of the insolvent vendor and of the vendee, to place the property beyond the reach of the suing creditors, in order that they might thereby drive them to compromises advantageous to the vendor, and with the understanding that the ultimate profits

BANK OF
MOBILE
*v.*
HARRIS.

upon the purchases, which were, in some cases at least, clearly below the market price, should inure to the benefit of the vendor.

By article 1977 of the code it is provided, that if the party with whom the debtor contracted, be in fraud, as well as the debtor, he shall not, on the annulling of the contract, be entitled to a restitution of the price or consideration he may have paid, except for so much as he shall prove has inured to the benefit of the creditors, by adding to the amount of property applicable to the payment of their debts.

The judgment of the district court, so far as it annuls the mortgage given by *E. B. Harris* to *John L. Harris* before *Jules Mossy*, notary public, on the 6th of June, 1848, so far as the plaintiffs are concerned, is affirmed. The judgment, in other respects, is reversed, and it is decreed that the sales by *E. B. Harris* to *John L. Harris*, in the summer of 1848, of two hundred and ninety shares of the stock of the New Orleans Canal and Banking Company, also of three hundred and five shares of the stock of the Bank of Louisiana, and three hundred shares of the stock of the Mechanics and Traders' Bank, be annulled, and subjected to the plaintiff's execution, reserving to the defendant, or to the banks, the right to claim out of the proceeds of the sales, the amounts for which they were pledged on the days of the transfers to *John L. Harris*, who is condemned to pay the costs in both courts.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

NOTE.—Cases not reported, decided during the period embraced in this volume.

AT NEW ORLEANS: *Dunbar* v. *Connor; Buchanan & Co.* v. *Ure; Same v. Same; Dubois* v. *Casas; Smith* v. *Scandling et al.; Creevy* v. *T. and G. Forbes; McBurney* v. *S. T. Taylor; State of Louisiana* v. *Robert Lintell; Stackhouse* v. *Owners and Captain Steamer J. T. Doswell; N. C. Hall* v. *McMiken; Salter and Marcy* v. *Steam Propeller Colonel Stanton and Owners; Voights and Jeanrenard* v. *Wintercast; David Mortmire* v. *P. L. Massey; John Patterson and Owners Bark Mary Parker* v. *Durrell and Barclay; Victor David* v. *H. D. Richardson; J. F. Bercier & Co.* v. *Terence Cook; Charles Dubouchel* v. *Adolphe Bougère; Le Blanc* v. *Nolan; Stewart* v. *Willman; Berger and Brown* v. *Thibodeaux; Hall, Administrator,* v. *Daunis; Wright* v. *Murphy; Mitchell* v. *Barrow; Thibodeaux* v. *Bernard; Sevin* v. *Louisa Hebert; J. L. Cole* v. *Est. Bergeron; Dupré* v. *Maronge; Same* v. *Same; King* v. *James and Henry Cage; Anjoux* v. *Denney; Robertson* v. *Kelly and Conyngham; Harned* v. *Gleason; M. and J. Levy* v. *Ursin Tournin, f. m. c.; Decoux* v. *Mourain; Demoruelle* v. *Dominque; Aubert* v. *Aubert; Boykin* v. *Daunis; Same* v. *Berger and Brown; Same* v. *Lirette; Player* v. *Dunlap; Mullens* v. *Amos and Roe; Dunbar* v. *Goodloe; Chilimachi Indians* v. *Bissell and Schlatre; Julienne* v. *Lapice; Franklin* v. *Police Jury of Madison; Childers* v. *T. R. Patton, her husband; Mayer* v. *Shaffer; Saloy* v. *Blache; Robertson et al.* v. *Armand Guyol; Mississippi Union Bank use of Jesse S. Ross* v. *Andrew Ellis, Sen., et al.; John Nolan* v. *W. Blanchard; Rosella Decoux and Husband* v. *Lucien Labry et al.; Barrow* v. *Leroy; Russ* v. *Vandanlingham; Hills, Tutor,* v. *Kimzie, Sheriff; Langfitt and Perry* v. *Crenan; Succession of Cotton; State* v. *Judge of Fifth District Court; Warren* v. *Saltenberer; May* v. *Burns; Crow* v. *Represen-*